FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

FEB 0 7 2020

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA ex
rel. LYDIA KEITA, and the STATE
OF GEORGIA ex rel. LYDIA KEITA,

      Plaintiffs/Relator,

v.

MILTON HALL SURGICAL
ASSOCIATES, LLC; JEFFREY
GALLUPS, M.D.; XENICUS, LLC;
ANDREW L. NACHMAN; and
PATHOLOGY LAB OF GEORGIA,
LLC,

      Defendants.

CIVIL ACTION FILE
No. 1:20-cv-_____

**1:20-CV-0566**
JURY TRIAL DEMANDED

**SEALED FILING**

## COMPLAINT

### Filed in camera and under seal
### pursuant to 31 U.S.C. § 3730(b)(2)

Relator Lydia Keita hereby brings this *qui tam* lawsuit to recover damages, penalties, relator's share, and other remedies available to the United States of America and herself under the False Claims Act, 31 U.S.C. §§ 3729–3732 (the "FCA") and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7(b) (the "AKS"), and to the State of Georgia and herself under the Georgia State False Medicaid Claims Act, O.C.G.A. § 49-4-168–168.6 (the "GSFMCA").

## INTRODUCTION

Relator Lydia Keita has over ten years of extensive experience in medical billing and coding. In June 2018, she took a position as an accounts receivable specialist at Milton Hall Surgical Associates, LLC ("Milton Hall"). Almost immediately, Keita witnessed a host of billing and compliance issues at the practice and determined that Milton Hall was engaged in a pervasive and regular practice of knowingly submitting false claims to Medicare, Medicaid, and private insurance companies.

Among other things, Keita observed Milton Hall submit claims to Medicare and Medicaid that were falsely up-coded; reflected medically unnecessary procedures; used the name and identification numbers of Medicare and Medicaid-credentialed practitioners who had not performed or otherwise supervised the services and procedures for which Milton Hall sought reimbursement; and were materially altered to ensure maximum reimbursement from the state and federal governments. Keita also identified overpayments made by Medicare and Medicaid to Milton Hall over several years that Milton Hall knowingly retained and failed to remit to state and federal authorities. She also observed Milton Hall execute an illegal kickback scheme pursuant to which Milton Hall billed Medicare and

- 2 -

Medicaid for laboratory and other services performed by Pathology Lab of Georgia as if the services were performed by Milton Hall.

Keita's efforts to prevent the submission of false and fraudulent claims to Medicare and Medicaid and to otherwise prevent violations of the FCA and GSFMCA were met with hostility and push-back. Ultimately, Milton Hall terminated her in retaliation for her attempts to report and bring an end to these unlawful practices. To support her claims of fraudulent conduct, Keita alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1.

Plaintiff Lydia Keita is a former employee of Defendant Milton Hall Surgical Associates, LLC. She may be contacted through undersigned counsel and submits herself to the jurisdiction of this Court for purposes of this lawsuit.

2.

Defendant Milton Hall Surgical Associates, LLC is a Georgia for-profit limited liability company with its principal office located at 3330 Preston Ridge Road, Alpharetta, Fulton County, Georgia 30005. Milton Hall can be served with process, when appropriate, through its registered agent, who at the time this

- 3 -

Complaint is filed is Peter Hasbrouck, 3379 Peachtree Road, Suite 400, Atlanta, Fulton County, Georgia 30326.

3.

Defendant Jeffrey Gallups, M.D. is the founder, owner, and operator of Milton Hall. Although Milton Hall was once jointly owned by several doctors, including Gallups, at some point after 2010, Gallups bought out the other partners and became sole owner. He can be served with process, when appropriate, personally at his place of business, 2365 Old Milton Parkway, Suite 300, Alpharetta, Fulton County, Georgia 30009.

4.

Defendant Xenicus, LLC ("Xenicus") is an Idaho for-profit limited liability company with its principal office located at P.O. Box 2649, McCall, Idaho 83638. Xenicus can be served with process, when appropriate, through its registered agent, who at the time this Complaint is filed is Andrew Nachman, 14029 Comfort Road, McCall, Idaho 83638.

5.

Defendant Andrew L. Nachman is the founder and CEO of Defendant Xenicus. He can be served with process, when appropriate, personally at his place of residence, 14029 Comfort Road, McCall, Idaho 83638.

- 4 -

6.

Defendant Pathology Lab of Georgia, LLC ("PLG") is a Georgia limited liability company with its principal office located at 900 Circle 75 Parkway, Suite 900, Atlanta, Georgia 30339. It can be served with process, when appropriate, through its registered agent, who at the time this Complaint is filed is Peter J. Iacobell, 900 Circle 75 Parkway SE, Suite 900, Atlanta, Georgia 30339.

7.

This Court has subject-matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) & (b) and 28 U.S.C. §§ 1331, 1345, and 1367.

8.

Venue is proper in this judicial district under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) & (c).

9.

Defendant Milton Hall is subject to personal jurisdiction in this judicial district and division because Milton Hall is a Georgia limited liability company and its principal offices are located in this district and division. Milton Hall also conducts substantial business in Georgia and has a registered agent in Georgia.

10.

Defendant Jeffrey Gallups, M.D. is subject to personal jurisdiction in this

judicial district and division because he is a resident of the state of Georgia.

11.

Defendant Xenicus is subject to personal jurisdiction in this judicial district and division because Xenicus solicits business in the state of Georgia and transacts business in the state of Georgia, including with Milton Hall, as set forth in this Complaint.

12.

Defendant Andrew L. Nachman is subject to personal jurisdiction in this judicial district and division because Nachman solicits business in Georgia, conducts substantial business in Georgia (including with Milton Hall, as set forth in this Complaint), and routinely travels to Georgia to conduct business within the state.

13.

The facts, allegations, transactions, and legal violations described in this Complaint are not already the subject of any civil suit or administrative proceeding to which the federal Government or the State of Georgia is a party. Although Milton Hall is one of approximately 468 named Defendants in *United States of America ex rel. Terri Nix et al. v. United Biologics, LLC d/b/a United Allergy Services f/k/a United Allergy Labs et al.*, No. 1:14-cv-1486-LMM (N.D. Ga. filed Apr. 27, 2017), the facts and legal violations alleged in that case are not the same or substantially

- 6 -

the same as and do not overlap in any way with the allegations and legal violations Plaintiff alleges in this case.

14.

Additionally, the facts, allegations, transactions, and legal violations described in this Complaint have not been publicly disclosed in any federal hearing in which the federal Government or the State of Georgia is a party, by the news media, or in any federal or state report, hearing, audit, or investigation.

15.

Even if there had been a public disclosure of the facts alleged in this Complaint, Relator Keita is an "original source" for purposes of 31 U.S.C. § 3730(e)(4)(B) and O.C.G.A. § 49-4-168.2(l)(1). As a former employee of Milton Hall, Keita has first-hand knowledge of all the information, facts, and schemes described in this Complaint. Keita also voluntarily disclosed the information in this Complaint to the United States Government via U.S. Department of Health and Human Services Office of Inspector General Special Agent Ryan S. Campos in November 2018, prior to filing this action.

16.

Under 31 U.S.C. § 3730(b), this Complaint is to be filed in camera and remain under seal for at least sixty days and shall not be served on Defendants until the

Court so orders. The Government may elect to intervene and proceed with the action within sixty days after the Government receives the Complaint or at such other time that the Court may order.

## FACTUAL BACKGROUND

### *The Relationship Between the Parties*

17.

Milton Hall does business as the Atlanta ENT Institute, a medical practice specializing in ear nose & throat ("ENT") services and facial plastic surgery. It has twelve locations in Georgia and one in Mississippi, and it advertises costs that are lower than those charged by hospitals or other medical practices for comparable services.

18.

Upon information and belief, Milton Hall employs approximately 200 individuals (including at least nine practicing physicians and twenty-eight practicing non-physician providers such as physician assistants, audiologists, and physical therapists). During calendar year 2018, the practice treated approximately 100,000 patients and generated approximately $26 million in revenue. Upon further information and belief, based on Keita's experience as an accounts-receivable

- 8 -

specialist at Milton Hall, a majority of the patients treated by Milton Hall are enrolled in Medicare and Medicaid.

19.

Relator Keita has over ten years of experience in medical coding and billing and has knowledge of the laws and regulations applicable to billing Medicare and Medicaid for medical services and procedures. Relator Keita attended Samford-Brown College where she received a certificate in medical billing and coding.

20.

Relator Keita was employed by Milton Hall as an accounts-receivable specialist from approximately June 19, 2018 through approximately August 23, 2018. In that role, her job duties included (without limitation) preparing and submitting claims to third-party payors (Medicare, Medicaid, and private insurance), following up on outstanding billing and collections matters, maintaining and updating patient accounts, and medical coding. She worked out of Milton Hall's central administrative office, which handles billing for all of Milton Hall's locations, including its surgery centers.

21.

Xenicus is a management consulting service company that, through its founder and CEO Andrew Nachman, provides business consulting, healthcare

- 9 -

consulting, financial, accounting, bookkeeping, business development, and other services to its clients.

22.

In 2018, one of Xenicus's clients was Milton Hall. Nachman personally provided consulting services to Milton Hall, including services and advice relating to Milton Hall's medical billing practices. For example, Nachman was responsible for how claims should be submitted to third-party payors, including Medicare and Medicaid, for reimbursement; instructed Milton Hall employees on which diagnostic and procedural codes to use when submitting claims to Medicare and Medicaid for reimbursement; and was responsible for monitoring and auditing claims submitted by Milton Hall for reimbursement to third-party payors (including Medicare and Medicaid) and the reimbursements received by Milton Hall from third-party payors, among other things. In his capacity as a billing consultant to Milton Hall, Nachman oversaw these services and interacted with numerous Milton Hall employees, including Relator Keita.

23.

Pathology Lab of Georgia ("PLG") was founded and is owned by its Medical Director, John D. Cochran and specializes in the pathology of patients seen by otolaryngologists (i.e., ear, nose, and throat providers), among other medical

specialists. As detailed below, PLG, Milton Hall, and Gallups operate an unlawful kickback arrangement pursuant to which Milton Hall bills for pathology services actually provided by PLG and remits a portion of the payment for those services to PLG, rather than PLG billing for its services directly.

### *Legal and Regulatory Framework*

24.

*Medicare.* Title XII of the Social Security Act, 42 U.S.C. § 1395, *et seq.*, establishes the Health Insurance for the Aged and Disabled Program, popularly known as the Medicare program. The Secretary of the United States Department of Health and Human Services ("HHS") administers the Medicare Program through the Centers for Medicare and Medicaid Services ("CMS").

25.

Medicare Part A provides basic insurance for the costs of hospitalization and post-hospitalization care. 42 U.S.C. § 1395c-1395i-2 (1992). Medicare Part B is a federally subsidized, voluntary insurance program that covers the fee schedule amount for laboratory services. 42 U.S.C. §§ 1395(k), 1395(i), 1395(s).

26.

Reimbursement for Medicare claims is made by the United States through CMS. CMS, in turn, contracts with private insurance carriers to administer and pay

Medicare Part B claims from the Medicare Trust Fund. 42 U.S.C. § 1395(u). In this capacity, the carriers act on behalf of CMS. 42 C.F.R. § 421.5(b).

27.

In order to receive Medicare funds, enrolled suppliers, including Defendants, together with their authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures issued by the states.

28.

Among the rules and regulations which enrolled suppliers, including Defendants, agree to follow are to: (a) bill Medicare Carriers for only those covered service which are medically necessary; (b) not bill Medicare Carriers for any services or items which were not performed or delivered in accordance with all applicable policies, nor submit false or inaccurate information relating to provider costs or services; (c) not engage in any act or omission that constitutes or results in over-utilization of services; (d) be fully licensed and/or certified under the applicable state and federal laws to perform the services provided to recipients; (e) comply with state and federal statutes, policies, and regulations applicable to the Medicare program; and (f) not engage in any illegal activities related to the furnishing of services to recipients.

29.

**Medicaid** is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. The federal involvement in Medicaid is largely limited to providing matching funds and ensuring that states comply with minimum standards in the administration of the program.

30.

**The False Claims Act**, 31 U.S.C. §§ 3729 – 3732 ("FCA"), creates liability for any person who knowingly submits a false claim to the government, causes or knowingly assists another to submit a false claim to the government, or knowingly makes a false record or statement to get a false claim paid by the government. The FCA also bars "reverse false claims" where one acts improperly to avoid having to pay money to the government. 31 U.S.C. § 3729. Title 31, Section 3729(a)(1)(G) expressly prohibits any person from knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the government. Under 42 U.S.C. § 1320a-7k(d)(3), "[a]ny overpayment retained by a person after the deadline for reporting and returning the overpayment under [§ 1320a-7k(d)(2)] is an obligation (as defined in section 3729(b)(3) of Title 31) for purposes of" the FCA. Thus, the FCA prohibits any person from knowingly

concealing or knowingly and improperly failing to return overpayments made by Medicare within the time provided by law.

31.

A violator of the FCA must pay a civil penalty of between $5,500 and $11,000 for each false claim and treble the amount of the government's damages. 31 U.S.C. § 3729.

32.

**The Georgia State False Medicaid Claims Act**, O.C.G.A. § 49-4-168, *et seq*. ("GSFMCA") imposes liability on any person who knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval; knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Georgia Medicaid program; conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid; has possession, custody or control of property or money used or to be used by the Georgia Medicaid program and, intending to defraud the Georgia Medicaid program or willfully to conceal the property, delivers, or causes to be delivered, less than the amount for which the person receives a certificate or receipt; knowingly makes, uses or causes to be made or used a false record or statement material to an obligation to pay or transmit

- 14 -

property or money to the Georgia Medicaid program; or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit property or money to the Georgia Medicaid program.

33.

Like the FCA, the GSFMCA, O.C.G.A. § 49-4-168(4), defines "obligation" to include overpayments made to recipients of Medicaid funds. Thus, the GSFMCA prohibits any individual from knowingly concealing or knowingly and improperly avoiding returning overpayments made by Medicaid within the time provided by law.

34.

**The Anti-Kickback Statute**, 42 U.S.C. § 1320a-7b(b) ("AKS"), arose out of Congressional concern that if those who influence healthcare decisions were allowed to have a financial stake in the selection of healthcare goods and services, their judgment might be tainted, resulting in goods and services being provided that are medically unnecessary, of poor quality, or even harmful.

35.

In the AKS, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care. Congress amended the AKS in 1977 and again

in 1987 to strengthen it. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

36.

Among other provisions, the AKS makes criminal certain types of remunerative arrangements:

(b) Illegal remunerations.

(1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both. 42 U.S.C. § 1320a-7b.

37.

Violation of the AKS subjects the perpetrator to exclusion from federal health care programs, civil money penalties of $50,000 per violation, and three times the

amount of remuneration paid. 42 U.S.C. § 1320a-7(b)(7) and (a)(7).

38.

Under the AKS, "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a-7b(g).

### *Defendants' False and Fraudulent Claims*

39.

During Keita's employment with Milton Hall, she observed numerous unlawful, false, and fraudulent practices by Milton Hall, Xenicus, Nachman, Gallups, and PLG. As discussed in greater detail below, these false and fraudulent claims included the following: (1) refusing to refund patient overpayments or timely reimburse Medicare and Medicaid for overpayments; (2) upcoding and changing diagnostic codes on claims submitted to Medicare and Medicaid for reimbursement; (3) allowing non-Medicare-credentialed and non-Medicaid-credentialed practitioners to bill Medicare and Medicaid using the credentials of Medicare and Medicaid-credentialed practitioners who did not perform or supervise the medical procedures; (4) billing Medicare and Medicaid for medically unnecessary procedures; (5) materially altering claims submitted to Medicare and Medicaid by, among other things, changing the dates of service on claims for the purpose of being

- 17 -

reimbursed for otherwise untimely-filed claims; (6) pass-through billing for services provided by other providers, such as PLG, and kickbacks associated with such billings; and (7) false claims submitted by Milton Hall and Gallups to Medicare and Medicaid seeking reimbursement for services performed by PLG that falsely represented that Milton Hall performed the services.

*Wrongfully Failing to Report and Reimburse Medicare and Medicaid Overpayments to State and Federal Authorities and Wrongfully Retaining Medicare and Medicaid Overpayments (Defendants Milton Hall, Xenicus, and Nachman)*

40.

Defendant Milton Hall obtained overpayments from Medicare and/or Medicaid but failed to report and remit those overpayments to the proper authorities, as required by law, despite knowing they had been overpaid and thus unlawfully retained the overpayments.

41.

Medical providers who receive funds under the Medicare program, such as Milton Hall, are required to identify and report overpayments to the CMS and return those self-identified overpayments by the later of 60 days after the date the overpayment is identified or the due date of any corresponding cost report, if applicable. 42 U.S.C. § 1320a-7k(d)(2); 42 C.F.R. § 422.326(d); Medicare Program, Reporting and Returning of Overpayment, 81 Fed. Reg. 7,654 (Feb. 12, 2016).

- 18 -

42.

Under 42 U.S.C. § 1320a-7k(d)(3), "[a]ny overpayment retained by a person after the deadline for reporting and returning the overpayment under [§ 1320a-7k(d)(2)] is an 'obligation' (as defined in section 3729(b)(3) of Title 31) for purposes of" the FCA that must be disclosed to the United States. The FCA thus prohibits any person from knowingly concealing or knowingly and improperly failing to return overpayments made by Medicare within the time provided by law.

43.

Similarly, medical providers in Georgia who receive funds under the Medicaid program, such as Milton Hall, are required to report self-identified overpayments to the Georgia Department of Community Health ("DCH") and return those overpayments to DCH after it has reviewed and approved the overpayment amount. *See* DCH Policies and Procedures for Medicaid/PeachCare for Kids, Part I, § 402.10 ("Self Disclosure"), *available at* https://dch.georgia.gov/self-disclosure.

44.

Being in "possession, custody, or control of property or money used or to be used by the Georgia Medicaid program and knowingly deliver[ing], or caus[ing] to be delivered, less than all of such property or money" to the appropriate authority is a violation of the GSFMCA. O.C.G.A. § 49-4-168.1(a)(4). Furthermore, any person

who knowingly conceals or knowingly and improperly avoids returning overpayments made by Medicaid within the time provided by law is in violation of the GSFMCA. O.C.G.A. § 49-4-168.1(a)(7).

45.

From June 19, 2018 until August 23, 2018, Keita reviewed Milton Hall's patient accounts and identified numerous overpayments by Medicare and Medicaid. Keita identified Medicare and Medicaid overpayments dating back to at least 2016 and continuing through 2018. Upon information and belief, those overpayments were never reported or returned to state or federal authorities.

46.

In approximately July 2018, Keita advised her supervisor that Milton Hall was in possession of overpayments made by Medicare and Medicaid. Keita advised her supervisor that she could initiate a refund process with respect to both patient and Medicare/Medicaid overpayments. Keita's supervisor instructed her not to initiate any refund process to ensure that Medicare/Medicaid was reimbursed for the identified overpayments.

47.

By this time at the latest, Milton Hall was aware of Medicare and Medicaid overpayments. But Milton Hall did not report or return those overpayments to CMS

- 20 -

or DCH, as required. Instead, when Keita questioned Milton Hall's practice, she was told the overpayments were not Milton Hall's problem because the government payors who made the overpayments in question should be aware that they overpaid and should request reimbursement from Milton Hall if the government wanted the money.

48.

Milton Hall not only failed to notify either federal or state authorities about Medicare overpayments it received but also knowingly and willfully retained Medicare overpayments by failing to return the Medicare overpayments that it identified to CMS.

49.

Milton Hall not only failed to notify either federal or state authorities about Medicaid overpayments it received but also knowingly and willfully retained Medicaid overpayments by failing to return the Medicaid overpayments it identified to DCH.

50.

Each time that Milton Hall knowingly and willfully retained overpayments, Milton Hall violated the FCA and the GSFMCA.

51.

Milton Hall engaged in a consistent practice of knowingly and willfully retaining Medicare and Medicaid overpayments—and in knowingly and willfully failing to report those overpayments to state and federal authorities as required by law—for the entire tenure of Keita's employment.

52.

Milton Hall engaged in a consistent practice of knowingly and willfully retaining Medicare and Medicaid overpayments—and in knowingly and willfully failing to report those overpayments to state and federal authorities as required by law—for years prior to Keita's employment; and upon information and belief, Milton Hall continues to engage in this practice to this day.

53.

Xenicus and Nachman were responsible for, among other things, analyzing and auditing Milton Hall's billing records; the claims submitted by Milton Hall to Medicare and Medicaid for reimbursement; and the payments received by Milton Hall from Medicare and Medicaid for services provided by Milton Hall. In their capacity as billing consultants for Milton Hall, Xenicus and Nachman were also responsible for identifying any overpayments in Milton Hall's possession and ensuring that such overpayments were returned to state and federal authorities within

the time provided by law.

54.

Xenicus and Nachman were aware that Milton Hall was in possession of overpayments from Medicare and Medicaid that it had neither reported nor returned. Nachman, as a representative of Xenicus, participated in a meeting in the Summer of 2018 at Milton Hall's offices where the Medicare and Medicaid overpayments were discussed. Relator Keita personally attended this meeting. Despite knowing that Milton Hall was in possession of overpayments from Medicare and Medicaid, Xenicus and Nachman failed to take any steps to ensure that the overpayments were reported and returned to CMS or DCH. Because Xenicus and Nachman were responsible for identifying and returning overpayments to CMS and DCH but failed to cause Milton Hall to report and return the overpayments, Xenicus and Nachman knowingly assisted and caused Milton Hall to unlawfully retain and fail to report Medicare and Medicaid overpayments in violation of the FCA and the GSFMCA.

55.

The precise amount of these overpayments is unknown, but in total, the sum of the overpayments that Milton Hall wrongfully retained is very significant.

- 23 -

*Upcoding*
*(Defendants Milton Hall, Xenicus, and Nachman)*

56.

Defendants Milton Hall, Xenicus, and Nachman also engaged in unlawful "upcoding," which is the practice of submitting claims to Medicare or Medicaid that contain billing codes for procedures not performed but that result in higher reimbursement than the procedures actually performed.

57.

Every claim that is submitted to a third party for payment (whether that third party is Medicare, Medicaid, or a private insurance company) includes codes reflecting the patient's diagnosis and the medical procedure(s) performed. Diagnosis codes are found in the International Classification of Diseases ("ICD") code set developed by the World Health Organization. Procedure codes are found in the Current Procedural Terminology ("CPT") code set developed by the American Medical Association and the Healthcare Common Procedure Coding System ("HCPCS") code set developed by CMS.

58.

Diagnosis and procedure codes set forth in claims submitted to Medicare and Medicaid must be correct and accurate because those codes are used by CMS,

Medicare Administrative Contractors ("MACs"), and Georgia's Medicaid program in determining coverage and reimbursement amounts.

59.

Diagnosis and procedure codes set forth in claims submitted to Medicare and Medicaid are material to decisions made by federal and state governments as to whether and how much to reimburse for a performed procedure.

60.

During Keita's tenure at Milton Hall, the company used a medical coding program known as Optum360 EncoderPro. When a patient is treated, the medical provider identifies diagnosis and procedure codes that the provider believes should be reflected on a medical bill. A coding specialist, such as Keita, then enters the codes in the EncoderPro system, which is supposed to analyze whether the coding meets applicable guidelines; if the program identifies an error, EncoderPro offers other diagnosis and/or procedure codes that might comply with the guidelines. At that point, the coding specialist should consult with the medical provider to determine how to bill for the patient's treatment.

61.

At Milton Hall, however, when EnCoderPro identified errors, the medical coders, including Keita, were routinely instructed to unilaterally change diagnosis

and procedure codes on claims, without consulting or notifying treating physicians and without regard to the medical treatments actually provided, and to submit the inaccurate claims to Medicare and Medicaid for reimbursement to ensure that Milton Hall received higher reimbursements than it would be entitled to receive if it billed using the accurate codes.

62.

When Keita was hired by Milton Hall, she was trained by another employee in Milton Hall's accounts receivable department, Pamala Ray, who had worked at Milton Hall for several years and was the medical-coding team lead.

63.

From approximately June 19, 2018 through August 23, 2018, Keita regularly witnessed Ray change the diagnosis and procedure codes to reflect procedures that were not performed but that carried higher rates of reimbursement than the procedures actually performed. Keita then witnessed Ray submit those fraudulently inflated claims reflecting the incorrect codes to Medicare or Medicaid for reimbursement.

64.

Ray instructed and trained Keita that it was Milton Hall's standard practice and procedure to select the diagnosis and procedure code that carried the highest

reimbursement rate, even if the diagnosis and procedure code selected did not reflect the procedure actually performed, and to submit the incorrect diagnosis and procedure codes to Medicare or Medicaid for reimbursement.

65.

Another Milton Hall accounts-receivable employee, Andrea Ebner, told Keita that if a claim was rejected or EncoderPro identified a problem with the selected codes, she (Keita) should simply select an alternative code, without regard to the actual medical procedures performed, that was most likely to get reimbursed by the payor, including Medicare and Medicaid, at the highest rate possible and resubmit the claim using that code.

66.

On several occasions, Nachman (acting as a representative of Xenicus) instructed Milton Hall employees, including Keita, to select diagnostic and procedure codes that did not reflect the procedures actually performed and to submit the inaccurate claims to Medicare and Medicaid for reimbursement at a higher rate than Milton Hall was entitled to receive.

67.

During her tenure at Milton Hall, Keita observed medical coding professionals changing diagnosis and procedure codes to reflect procedures not performed for the

purpose of receiving higher reimbursement rates from government payors multiple times a day.

68.

As an example of the types of upcoding in which Milton Hall routinely engaged, on numerous occasions between June 2018 and August 2018, Keita witnessed Ray bill Medicare and Medicaid using CPT codes 99214 or 99215 instead of the correct CPT codes 99212 or 99213.

69.

CPT codes 99212 and 99213 are used for patient office visits that generally last between 10 and 15 minutes. These two codes typically are used in well over 50% of office visits.

70.

CPT code 99214 is a code for the second highest level of care for a patient's office visit; these visits typically last about 25 minutes. A CPT code 99214 produces a higher reimbursement than either a 99212 or 99213 code.

71.

CPT code 99215 is for the most complex types of patient office visits—appointments that typically take about 40 minutes. It is generally used in only 5% of office visits. A CPT code of 99215 produces a reimbursement that is up

to 25% greater than even a CPT code 99214 and is much greater than either a 99212 or 99213 code.

72.

To the best of Keita's recollection, more than 50% of Milton Hall's office visits were billed using the more complex 99214 and 99215 codes, even though most of these office visits should have been billed using codes 99212 or 99213 because most of the office visits at Milton Hall lasted no more than 15 minutes.

73.

On at least one occasion, a claim was rejected because a third-party payor determined that the diagnosis code and the prescribed medication's National Drug Code ("NDC") were incompatible. Ebner told Keita to resubmit the bill using a different NDC code without consulting the treating physician and without regard to the medical procedures actually performed. Keita did not do as Ebner, Ray, and others at Milton Hall instructed her to do; she refused to manipulate procedure and diagnosis codes to artificially inflate Milton Hall's reimbursement rate.

74.

Milton Hall regularly manipulated procedure and diagnosis codes to obtain higher reimbursements from Medicare and Medicaid during the entire tenure of Keita's employment.

- 29 -

75.

Upon information and belief, Milton Hall's regular practice of manipulating procedure and diagnosis codes to obtain higher reimbursements from Medicare and Medicaid occurred for years prior to Keita's employment and continues today.

76.

Each time that Milton Hall knowingly and willfully manipulated procedure and diagnosis codes and submitted claims to Medicare and Medicaid reflecting the inaccurate procedure and diagnostic codes to obtain a higher reimbursement from Medicare and Medicaid, it submitted a false claim in violation of the FCA and the GSFMCA.

77.

By instructing Milton Hall employees to alter medical diagnosis and procedure codes to reflect procedures that were not performed and to submit fraudulent bills to Medicare and Medicaid for reimbursement, Nachman and Xenicus knowingly assisted and caused Milton Hall to submit false claims in violation of the FCA and the GSFMCA.

78.

Keita does not currently know the total amount by which Milton Hall improperly billed Medicare and Medicaid through knowingly and willfully utilizing

improper diagnostic codes that resulted in inflated reimbursements. But Keita has reason to believe the amount is significant. For example, when Keita was hired, BlueCross BlueShield ("BCBS") was in the process of conducting an audit of Milton Hall's billing practices. Keita was informed that BCBS was withholding approximately $8 million from Milton Hall because of what BCBS had identified as excessive upcoding. Since many more of Milton Hall's patients were enrolled in Medicare and Medicaid than were covered by BCBS, the amount Milton Hall improperly received as a result of unlawful upcoding in Medicare and Medicaid bills is likely much higher.

*Unlawful Retention of Overpayments Received Resulting from Unlawful Upcoding*
*Reverse False Claims*
*(Defendants Milton Hall, Xenicus, and Nachman)*

### 79.

Additionally, Milton Hall unlawfully retained and failed to report overpayments made to it as a result of materially altered claims, and Xenicus and Nachman knowingly assisted and facilitated this unlawful conduct despite their obligation to ensure that Milton Hall reported and returned Medicare and Medicaid overpayments.

### 80.

Each time that Milton Hall was reimbursed by Medicare or Medicaid for

claims that had been unlawfully upcoded, Milton Hall received an "overpayment" from Medicare and Medicaid because Milton Hall received more money than it was entitled to receive.

81.

Milton Hall knew that it was in possession of overpayments because Milton Hall intentionally changed diagnostic and procedure codes to reflect procedures not actually performed for the purpose of receiving a higher reimbursement than it was entitled to receive.

82.

Milton Hall was obligated to report and return these overpayments to CMS and DCH within the time provided by law.

83.

Milton Hall failed to notify federal or state authorities about Medicare overpayments it received and knowingly and willfully retained Medicare overpayments by failing to return the Medicare overpayments that it identified to CMS.

84.

Milton Hall failed to notify federal or state authorities about Medicaid overpayments it received and knowingly and willfully retained Medicaid

overpayments by failing to return the Medicaid overpayments it identified to DCH.

85.

Each time that Milton Hall knowingly and willfully retained overpayments resulting from its unlawful upcoding of procedure and diagnostic codes, Milton Hall violated the FCA and the GSFMCA.

86.

Xenicus and Nachman were responsible, as agents of Milton Hall, for analyzing and auditing the payments received by Milton Hall from Medicare and Medicaid. Xenicus and Nachman were also responsible for identifying any overpayments and ensuring that overpayments were reported and returned to CMS and DCH within the time provided by law.

87.

Nachman and Xenicus were aware that Milton Hall was in possession of overpayments because Nachman and Xenicus instructed Milton Hall employees to change the diagnostic codes on claims submitted to Medicare and Medicaid for the purpose of receiving higher reimbursements than it was entitled to receive.

88.

Nachman and Xenicus failed to take any steps to ensure that the overpayments were reported and returned to CMS or DCH. Because Xenicus and Nachman were

responsible for identifying and returning overpayments to CMS and DCH but failed to cause Milton Hall to report and return the overpayments, Xenicus and Nachman knowingly assisted and caused Milton Hall to unlawfully retain Medicare and Medicaid overpayments in violation of the FCA and the GSFMCA.

*Materially Altering Claims*
*(Defendants Milton Hall, Xenicus, and Nachman)*

89.

Milton Hall, Xenicus, and Nachman also systematically made material alterations to claims submitted to Medicare and Medicaid in order to obtain payments to which they were not legally entitled.

90.

Medical bills submitted to Medicare or Medicaid for reimbursement must reflect the date on which services billed for were provided, in addition to accurate diagnosis and procedure codes.

91.

Applicable regulations and guidelines provide deadlines within which Medicare and Medicaid claims must be submitted for payment after the date of service. Specifically, a Medicare or Medicaid claim must be filed no later than 12 months after the date that the service for which reimbursement is sought in the claim was provided.

92.

As with the procedure and diagnostic codes, federal and state governments rely upon the date of service identified in a Medicare and Medicaid claim in determining whether and how much of a claim to pay; and those dates are material to the decision to pay a claim.

93.

Xenicus and Nachman, while they were agents of Milton Hall and acting on Milton Hall's behalf, instructed Keita and other employees of Milton Hall to change dates of service and submit what would otherwise have been untimely claims for payment to Medicare and Medicaid.

94.

Xenicus and Nachman, while they were agents of Milton Hall and acting on Milton Hall's behalf, also instructed Keita and other Milton Hall Employees to change the dates of services on claims that had been submitted and rejected as untimely and to resubmit those claims to Medicare and Medicaid with a timely—but false—date of service listed.

95.

For example, on August 21, 2018, Nachman (acting as a representative of Xenicus) instructed Keita to resubmit a bill using dates of service that were five

months *later* than the dates on which the services were actually provided after the claim had been denied. The true dates of service were outside the billing deadline, but the fraudulent, later dates of service Nachman instructed Keita to use in the claim would have made the claim appear timely.

96.

Keita refused to comply with those instructions to change the dates of service and refile untimely claims with Medicare and Medicaid.

97.

When Keita questioned Milton Hall's practices relating to changing diagnostic codes, procedure codes, and dates of service, Pamala Ray told her that she should expect to see unusual things at Milton Hall but that she should simply do as she was told and refrain from asking questions.

98.

Keita reported Ray to Milton Hall's chief financial officer, but upon information and belief, nothing was done to address the ongoing, unlawful practice of using false and fraudulent codes and dates of service in bills submitted for reimbursement to Medicare or Medicaid. Instead, Milton Hall labeled Keita a problem-starter and "energy vampire," refused to provide Keita with further training, and eventually terminated her employment.

99.

Milton Hall regularly materially altered and submitted claims to obtain higher reimbursements from Medicare and Medicaid during the entire tenure of Keita's employment.

100.

Upon information and belief, Milton Hall's regular practice of materially altering claims to obtain higher reimbursements from Medicare and Medicaid occurred for years prior to Keita's employment and continues today.

101.

Each time that Milton Hall knowingly and willfully materially altered claims and submitted those claims to Medicare or Medicaid to obtain a higher reimbursement rate, it submitted a false claim in violation of the FCA and the GSFMCA.

102.

Xenicus and Nachman instructed Milton Hall employees to materially alter claims submitted to Medicare and Medicaid by, among other things, changing the dates of service on the claims submitted to Medicare and Medicaid so that Milton Hall would be reimbursed for an otherwise untimely claim. Xenicus and Nachman thus knowingly assisted and caused Milton Hall to submit false claims for

reimbursement in violation of the FCA and GSFMCA.

*Unlawful Retention of Overpayments Received Resulting from Materially*
*Altering Claims – Reverse False Claims*
*(Defendants Milton Hall, Xenicus, and Nachman)*

103.

Milton Hall unlawfully retained and failed to report overpayments made to it
as a result of such materially altered claims. Xenicus and Nachman knowingly
assisted and facilitated this unlawful practice, despite their obligation to ensure that
Milton Hall reported and returned Medicare and Medicaid overpayments.

104.

Each time that Milton Hall was reimbursed by Medicaid or Medicare for
claims that were materially altered to induce payment Milton Hall was not entitled
to receive (such as for untimely claims altered to reflect a fraudulent date of service),
Milton Hall received an overpayment.

105.

Milton Hall knew that it was in possession of these overpayments because
Milton Hall intentionally made the unlawful alterations (including changing dates of
service so it could be reimbursed for otherwise untimely claims).

106.

Milton Hall was obligated to report and return these overpayments to CMS

and DCH within the time provided by law.

107.

Milton Hall failed to notify federal or state authorities about Medicare overpayments it received and knowingly and willfully retained Medicare overpayments by failing to return the Medicare overpayments that it identified to CMS.

108.

Milton Hall failed to notify federal or state authorities about Medicaid overpayments it received and knowingly and willfully retained Medicaid overpayments by failing to return the Medicaid overpayments it identified to DCH.

109.

Each time that Milton Hall knowingly and willfully retained and failed to report these overpayments, Milton Hall violated the FCA and the GSFMCA.

110.

Xenicus and Nachman were responsible, as agents of Milton Hall, for analyzing and auditing the payments received by Milton Hall from Medicare and Medicaid. Xenicus and Nachman were also responsible for identifying any overpayments and ensuring that overpayments were reported and returned to CMS and DCH within the time provided by law.

111.

Xenicus and Nachman were aware that Milton Hall was in possession of overpayments because Nachman (acting as a representative of Xenicus) instructed Milton Hall employees to materially alter claims by, among other things, changing the dates of service on claims for the purpose of inducing Medicare or Medicaid to reimburse Milton Hall for claims that were not reimbursable.

112.

Because Xenicus and Nachman were responsible for identifying and returning overpayments to CMS and DCH but failed to cause Milton Hall to report and return the overpayments, Xenicus and Nachman knowingly assisted and caused Milton Hall to unlawfully retain Medicare and Medicaid overpayments in violation of the FCA and the GSFMCA.

*Billing for Services by Non-Credentialed Practitioners*
*(Defendant Milton Hall)*

113.

Defendant Milton Hall also submitted false claims in violation of the FCA and the GSFMCA by billing for services rendered by practitioners who were not credentialed to provide such services.

114.

Medicare and Medicaid require healthcare providers to be credentialed in order to bill Medicare and Medicaid for services provided to patients and to be reimbursed for those services.

115.

Some of Milton Hall's medical providers are credentialed to bill Medicare and Medicaid for medical services; others are not. In violation of Medicare and Medicaid rules (and the FCA and GSFMCA), Milton Hall submitted claims for reimbursement to Medicare and Medicaid for services performed by providers who are not appropriately credentialed.

116.

To accomplish this fraud, when a non-credentialed provider provided a service that Milton Hall wanted to improperly bill to Medicare or Medicaid, Milton Hall would use the name and national provider identification ("NPI") number of Medicare and Medicaid-credentialed practitioners in the claims submitted for reimbursement *even though the properly credentialed provider neither provided nor supervised the treatment*.

117.

To facilitate this routine fraud, Milton Hall maintained a list of all its

- 41 -

practitioners that identified those who were credentialed by Medicare and Medicaid and those who were not. When a non-credentialed practitioner performed services that could otherwise be reimbursable from Medicare or Medicaid, the list specified which credentialed practitioner should be fraudulently substituted for the practitioner who actually performed the services before the claim was submitted to Medicare or Medicaid for reimbursement.

118.

Using this list, Milton Hall regularly submitted (and upon information and belief, continues to submit) claims to Medicare and Medicaid for reimbursement with materially altered provider names.

119.

Milton Hall would alter such claims to include the names and NPI numbers of credentialed providers even though the medical records and charts demonstrate that, in fact, a *non-credentialed provider* performed the services.

120.

In some instances, Milton Hall made such fraudulent alterations to claims submitted to Medicare and Medicaid even when the credentialed provider worked at a *different* Milton Hall location than the location where the services were actually provided.

- 42 -

121.

For example, during Keita's employment at Milton Hall, she witnessed Milton Hall submit claims on numerous occasions for reimbursement to Medicare and Medicaid that identified Dr. Gallups as the treating physician even though Dr. Gallups did not perform the services for which Milton Hall sought reimbursement and was not even at the location where the services were actually provided on the date of service.

122.

The correct identification of the practitioner who provided the services in a claim submitted to Medicare and Medicaid is material to the government's decision whether to pay such a claim.

123.

For numerous claims submitted before, during, and (upon information and belief) after Keita's tenure, Milton Hall was reimbursed for services billed to Medicare and Medicaid because Milton Hall fraudulently listed a credentialed provider when in fact the services for which Milton Hall sought reimbursement were provided by a non-credentialed provider.

124.

Each time that Milton Hall submitted a claim for reimbursement to Medicare or Medicaid with a false identification of the provider while knowing that the individual who actually performed the services for which reimbursement was sought was not credentialed by Medicare or Medicaid, Milton Hall submitted a false claim for payment in violation of the FCA and the GSFMCA.

125.

Milton Hall's decision to submit claims to Medicare and Medicaid using the credentials of physicians who did not provide the treatment and services billed for was knowing, willful, and intended specifically to induce Medicare and Medicaid to reimburse Milton Hall for services that Medicare and Medicaid would otherwise not have reimbursed.

126.

Upon information and belief, Milton Hall's regular practice of submitting claims for reimbursement to Medicare or Medicaid using the credentials of a physician who did not provide the treatment and services being billed occurred for years prior to Keita's employment and continues today.

*Unlawful Retention of Overpayments Resulting from Billing for Services by Non-
credentialed Practitioners – Reverse False Claims
(Defendant Milton Hall)*

127.

Additionally, Milton Hall unlawfully retained and failed to report
overpayments made to it as a result of false claims submitted to Medicare and
Medicaid using the credentials of providers who did not, in fact, provide the services
for which it sought reimbursement.

128.

Each time Medicare or Medicaid reimbursed Milton Hall for services that
were provided by non-credentialed practitioners, Milton Hall received an
"overpayment" because Milton Hall was reimbursed for services for which it was
not entitled to be reimbursed.

129.

Milton Hall knew it was in possession of these overpayments because Milton
Hall intentionally submitted claims to Medicare and Medicaid fraudulently
identifying credentialed providers when the services for which reimbursement was
actually sought were performed by non-credentialed practitioners.

130.

Milton Hall was obligated to report and return these overpayments to CMS

and DCH within the time provided by law.

### 131.

Milton Hall failed to notify federal or state authorities about Medicare overpayments it received and knowingly and willfully retained Medicare overpayments by failing to return the Medicare overpayments that it identified to CMS.

### 132.

Milton Hall failed to notify federal or state authorities about Medicaid overpayments it received and knowingly and willfully retained Medicaid overpayments by failing to return the Medicaid overpayments it identified to DCH.

### 133.

Each time that Milton Hall knowingly and willfully retained and failed to report overpayments resulting from submitting claims to Medicare and Medicaid fraudulently identifying credentialed services providers when the services for which reimbursement was actually sought were performed by non-credentialed practitioners, Milton Hall violated the FCA and the GSFMCA.

*Billing for Medically Unnecessary Procedures*
*(Defendant Milton Hall)*

### 134.

Milton Hall also submitted claims to Medicare and Medicaid that sought

reimbursement for procedures that Milton Hall knew were medically unnecessary.

135.

All Medicare and Medicaid benefits are determined by medical necessity. When a provider submits a claim to Medicare or Medicaid for payment, the provider must include information showing that the services it rendered were reasonable and necessary. The provider must also certify that the services identified in the claim for which it seeks reimbursement were medically necessary.

136.

In a further attempt to boost its revenue and profit margins, Milton Hall regularly performs procedures on patients that it knows are medically unnecessary and then submits bills to Medicare and Medicaid for reimbursement for the medically unnecessary procedures.

137.

For example, whenever a patient would visit Milton Hall complaining of an earache, Milton Hall would perform a CT scan on the patient, despite knowing that a CT scan is medically unnecessary under such circumstances. Milton Hall then billed Medicare or Medicaid for the CT scan, despite knowing the CT scan was medically unnecessary. Upon information and belief, approximately *half* or more of

Milton Hall's patients were receiving CT scans during the time period of Keita's employment.

138.

Keita was informed that Milton Hall's excessive use of CT scans was one of the issues raised in the BCBS audit that was ongoing when Keita was hired.

139.

Milton Hall knew at the time it ordered and provided these procedures that they were not medically necessary or appropriate based on the patient's symptoms, complaints, and diagnoses (if any). The procedures were ordered and provided only to provide an enhanced billing opportunity for the practice.

140.

If Milton Hall had informed Medicare and Medicaid that the services in claims it submitted were not medically necessary, Medicare and Medicaid would not have reimbursed the claims.

141.

But Milton Hall falsely certified in claims it submitted for reimbursement to Medicare and Medicaid that the services identified were medically necessary, even when those services were not medically necessary.

- 48 -

142.

Milton Hall therefore knowingly made false representations and certifications regarding medical necessity which were material to the federal and State government's payment of claims with the intention to obtain payments from state and federal governments to which it was not legally entitled.

143.

Each time that Milton Hall knowingly and willfully submitted a claim to Medicare or Medicaid for services that were not medically necessary, it submitted a false claim in violation of the FCA and the GSFMCA.

144.

Each time that Milton Hall knowingly and willfully submitted a claim to Medicare or Medicaid falsely certifying that the services for which it sought reimbursement were medically necessary, it submitted a false claim in violation of the FCA and the GSFMCA.

145.

Milton Hall regularly submitted claims for medically unnecessary services during the entire tenure of Keita's employment.

146.

Upon information and belief, Milton Hall's regular practice of submitting

claims for medically unnecessary services occurred for years prior to Keita's employment and continues today.

*Unlawful Retention of Overpayments Resulting from Billing for Medically Unnecessary Procedures – Reverse False Claims (Defendant Milton Hall)*

147.

Additionally, Milton Hall unlawfully retained and failed to report overpayments made to it as a result of claims it submitted to Medicare and Medicaid in which it falsely certified that certain procedures were medically necessary when such procedures were in fact medically unnecessary.

148.

Each time that Medicare or Medicaid reimbursed Milton Hall for medically unnecessary procedures, Milton Hall received an "overpayment" because Milton Hall was reimbursed for services for which it was not entitled to be reimbursed.

149.

Milton Hall knew it was in possession of these overpayments because Milton Hall intentionally submitted claims to Medicare and Medicaid for reimbursement of procedures that it knew were not medically necessary yet falsely certified *were* medically necessary.

150.

Milton Hall was obligated to report and return these overpayments to CMS and DCH within the time provided by law.

151.

Milton Hall failed to notify federal or state authorities about Medicare overpayments it received and knowingly and willfully retained Medicare overpayments by failing to return the Medicare overpayments that it identified to CMS.

152.

Milton Hall failed to notify federal or state authorities about Medicaid overpayments it received and knowingly and willfully retained Medicaid overpayments by failing to return the Medicaid overpayments it identified to DCH.

153.

Each time that Milton Hall knowingly and willfully retained and failed to report overpayments resulting from submitting claims for reimbursement for medically unnecessary procedures, Milton Hall violated the FCA and the GSFMCA.

*Pass-Through Billing for Laboratory Services, and Kickbacks*
*(Defendants Milton Hall, Gallups, and Pathology Lab of Georgia)*

154.

Milton Hall and Gallups also engaged into an illegal kickback agreement with

Defendant PLG. Under the terms of that agreement, Milton Hall agreed to use PLG

to perform certain laboratory services. In exchange, Milton Hall submitted claims to

Medicare or Medicaid directly using CPT code 88304, which falsely indicated that

Milton Hall (and not PLG) had performed the laboratory services. Milton Hall would

then share a percentage of any reimbursement from Medicare or Medicaid with PLG,

in violation of the AKS and other applicable law.

155.

When an outside laboratory performs a laboratory test referred by a physician

on behalf of a patient who is a Medicare or Medicaid recipient, the outside laboratory

is supposed to bill Medicare or Medicaid directly for the procedure unless one of a

limited number of exceptions applies.

156.

Milton Hall, Gallups, and PLG, however, engage in what is known as "pass-

through billing." Specifically, Milton Hall sends specimens to PLG for examination;

PLG then performs laboratory tests on the specimens and returns the results of the

laboratory tests to Milton Hall; Milton Hall then submits claims to Medicare and

- 52 -

Medicaid for reimbursement for the laboratory services provided by PLG, but falsely represents to Medicare and Medicaid that Milton Hall (not PLG) performed the services for which Milton Hall seeks reimbursement; and finally, once Medicare and Medicaid reimburses Milton Hall for the procedures, Milton Hall sends a percentage of the reimbursed amounts to PLG. Keita observed Milton Hall submit bills for reimbursement to Medicare and Medicaid for the laboratory services that PLG performed as though Milton Hall had provided those services itself on several occasions during her employment.

157.

Keita notified Milton Hall that it was improperly submitting claims for laboratory services performed by PLG. When she raised those concerns, she was told that Gallups and Dr. John D. Cochran, Medical Director of PLG, had agreed to the kickback scheme. Specifically, Keita was told that Dr. Gallups and Dr. Cochran had met in person prior to Keita's arrival and agreed to the kickback scheme described above. Keita was also shown a contract—signed by Gallups on behalf of Milton Hall and Cochran on behalf of PLG—that appeared to set forth the kickback scheme described above. Thereafter, Keita emailed a copy of the contract to the director of revenue at PLG requesting information about the agreement. No one from PLG ever responded to Keita's request.

158.

Upon information and belief, none of the exceptions to the general rule that PLG was required to bill Medicare or Medicaid directly apply, and the pass-through billing described above is not in conformance with the appropriate and standard billing practices for providers and laboratories.

159.

Kickback schemes like the one Milton Hall, Gallups, and PLG engaged in pose a number of threats to the integrity of the healthcare system, as they can allow a laboratory to avoid government scrutiny while receiving payment for services that would otherwise not be reimbursable by Medicare or Medicaid (for example, because of a lack of contract or because the laboratory does not meet program requirements). These schemes can also result in double-billing if both the provider (Milton Hall) and the laboratory (PLG) bill Medicare or Medicaid for the same services.

160.

By engaging in the kickback scheme described above, Milton Hall and PLG violated the AKS. Furthermore, Gallups caused Milton Hall to engage in the unlawful kickback scheme described above, and therefore knowingly caused and assisted Milton Hall in violating the AKS. Gallups is thus liable, along with Milton

Hall and PLG, for violating the AKS.

161.

Each time Milton Hall submitted a claim to Medicare or Medicaid for the laboratory services performed by PLG, it submitted a false or fraudulent claim in violation of the FCA because the claim resulted from a violation of the AKS.

*Submission of False Claims in Furtherance of the*
*Pass-Through Billing and Kickbacks*
(*Defendants Milton Hall, PLG, and Gallups*)

162.

In addition to violating the AKS, the unlawful kickback scheme engaged in by Milton Hall, PLG, and Gallups as described above also resulted in the submission of false and fraudulent claims to Medicare and Medicaid for reimbursement in violation of the FCA and the GSFMCA.

163.

The correct identification of the entity that performed the services for which reimbursement is sought is material to Medicare and Medicaid's decision whether to reimburse such claims. If Medicare and Medicaid know that the entity submitting claims for reimbursement is not the entity that performed the services, Medicare and Medicaid will not pay the claims.

164.

Each time that Milton Hall submitted a claim to Medicare or Medicaid for reimbursement of laboratory services performed by PLG but falsely represented that Milton Hall (and not PLG) had performed the services for which Milton Hall sought reimbursement, Milton Hall submitted a false claim in violation of the FCA and GSFMCA.

165.

Gallups caused Milton Hall to engage in the unlawful pass-through billing and kickback scheme described above, knowing that this arrangement would result in Milton Hall submitting false claims for reimbursement to Medicare and Medicaid for services not performed by Milton Hall. Gallups thus knowingly caused and assisted Milton Hall to submit false claims to Medicare and Medicaid in violation of the FCA and the GSMFCA.

166.

PLG entered into the unlawful pass-through billing and kickback scheme with Milton Hall described above. PLG knew, or should have known, that this arrangement would result in Milton Hall submitting false claims for reimbursement to Medicare and Medicaid for services and procedures not performed by Milton Hall. PLG thus knowingly caused and assisted Milton Hall to submit false claims to

Medicare and Medicaid in violation of the FCA and the GSFMCA.

*Milton Hall's Retaliation Against Relator Keita*

167.

Relator Keita came to Milton Hall with prior experience working in medical coding and billing, and she quickly recognized that what Defendants were doing, and what they were instructing her and other Milton Hall employees to do, was unlawful.

168.

Keita raised concerns about Milton Hall's failure to report and reimburse overpayments from Medicare and Medicaid, the fact that its staff would unilaterally change billing codes and dates of service, and its manipulation of medical bills in ways designed to result in reimbursement at higher rates than were allowed (among other unlawful acts as described in this Complaint). All of these unlawful acts, upon information and belief, were done at the direction and with the active participation of Gallup, Nachman, and Xenicus, who were intimately involved in every stage of the billing process, regardless of the payor on a particular claim.

169.

In response to her complaints, Milton Hall told Keita to stop asking questions, placed her on a performance improvement plan for being an "energy vampire" (*i.e.*,

someone who does not have a "positive and enthusiastic attitude"), and ultimately terminated her employment.

170.

On August 21, 2018, Nachman instructed Keita to resubmit a claim that had been denied using dates of service that were five months later than the dates on which the services were actually provided. The true dates of service were outside the billing deadline but the fraudulent later dates of service that Keita was instructed to state in the claim would make the claim appear timely.

171.

Keita refused to falsify the claim as Nachman instructed. And on the morning of August 22, she sent an e-mail telling Nachman that the correct approach to getting paid on the denied claim was to submit an amended claim with the original (accurate) dates of service. Keita also told Andrea Ebner that following Nachman's instruction would be considered fraudulent billing.

172.

On the afternoon of August 22, 2018, the same day that she refused to follow Nachman's directive and complained to Ebner that to do so would be fraudulent, Keita was called into a meeting, and her employment was terminated.

173.

Keita's termination was after and in retaliation for complaining about, refusing to be complicit in, and attempting to prevent unlawful billing practices in violation of the FCA and GSFMCA.

### CAUSES OF ACTION

#### Count I: Presentation of False Claims to the U.S. Government
#### 31 U.S.C. § 3729(a)(1)(A)
#### (All Defendants)

174.

Keita incorporates the preceding allegations as if fully restated herein.

175.

Defendants have knowingly presented and caused to be presented multiple false and fraudulent claims to the United States Government for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

176.

Defendants violated § 3729(a)(1)(A) by, *inter alia*: (1) submitting claims for services that carried higher reimbursement rates than the services actually provided (i.e., upcoded claims); (2) submitting claims on which diagnostic and procedure codes had been altered without the approval of the medical provider when other diagnostic or procedure codes with lower reimbursement rates were appropriate; (3)

submitting claims for services that were provided by non-Medicare-credentialed or non-Medicaid-credentialed providers yet billed using the names and NPI numbers of credentialed providers; (4) submitting claims that expressly or implicitly certified that certain procedures were medically necessary when Defendants knew that they were not; (5) submitting claims for reimbursement for laboratory and other services that were performed by PLG but that represented that Milton Hall performed the services so that the United States Government would reimburse Milton Hall for services it did not perform; and (6) submitting claims for reimbursement that resulted from a violation of the AKS.

177.

Although Milton Hall was the billing entity, Nachman, Xenicus, Gallups, and PLG actively participated in the violations of § 3729(a)(1)(A) described in this Complaint and Count by either knowingly submitting false claims to the United States Government for reimbursement or by knowingly assisting and causing false claims to be submitted to the United States Government.

178.

Defendants' conduct described in this Count was knowing in that Defendants had actual knowledge that the claims being submitted to Medicare and Medicaid for payment were false and fraudulent and Defendants intentionally submitted those

false or fraudulent claims, or knowingly and intentionally assisted and caused the submission of such claims, to cause the United States Government to pay them amounts to which they were not legally entitled. At a minimum, Defendants acted with at least deliberate ignorance or reckless disregard of the false and fraudulent nature of the claims.

179.

The United States Government paid false and fraudulent claims submitted by Defendants and has therefore suffered substantial damages as a consequence of Defendants' unlawful conduct. Defendants received payment and were thereby enriched and profited from the unlawful, false, and fraudulent conduct described in this Count.

### Count II: False Records and Statements—Payments from the U.S. Government
### 31 U.S.C. § 3729(a)(1)(B)
### (All Defendants)

180.

Keita incorporates the preceding allegations as if fully restated herein.

181.

Defendants knowingly made, used, and caused to be made and used false records and statements material to false and fraudulent claims submitted to the United States Government for payment, in violation of 31 U.S.C. § 3729(a)(1)(B).

182.

Defendants violated § 3729(a)(1)(B) by, *inter alia*: (1) altering the billing codes and dates of services on medical bills before submitting claims based upon the altered bills to Medicare or Medicaid for payment; (2) making corresponding alterations to patients' medical records and other documentation to support the false and fraudulent medical bills; (3) submitting claims to the United States Government using the identities and NPI numbers of Medicare-credentialed providers or Medicaid-credentialed providers that were in fact provided by non-credentialed providers; (4) certifying that medical procedures were medically necessary when they were not; (5) creating and submitting bills indicating that pathologic laboratory services were provided by Milton Hall when in fact they were provided by PLG; and (6) creating and submitting claims that resulted from a violation of the AKS.

183.

Although Milton Hall was the billing entity, Gallups, Nachman, Xenicus, and PLG actively participated in the violations of § 3729(a)(1)(B) described in this Complaint and Count by either making and using false records and statements material to false and fraudulent claims, or by knowingly causing and assisting the creation of false records and statements material to false and fraudulent claims.

- 62 -

184.

Defendants' conduct described in this Count was knowing because Defendants had actual knowledge that the records and statements being made and used were false, fraudulent, and material to the United States Government's decision to pay the false claims submitted by Defendants.

185.

Defendants acted with at least deliberate ignorance or reckless disregard of the false nature of the records and statements being made and used in connection with these false claims.

186.

The United States Government relied on the false records and statements prepared, used, and submitted by Defendants in deciding to pay the false and fraudulent claims submitted by Defendants, and has therefore suffered substantial damages as a consequence of Defendants' unlawful conduct. And Defendants have received payment and been thereby enriched and profited, from the unlawful, false, and fraudulent conduct described in this Count.

***Count III: Reverse False Claims in violation of***
***31 U.S.C. § 3729(a)(1)(G)***
***(Defendants Milton Hall, Xenicus, and Nachman)***

187.

Keita incorporates the preceding allegations as if fully restated herein.

188.

Defendants have knowingly concealed and knowingly and improperly
avoided or decreased their obligation to pay or transmit money or property to the
United States Government in violation of 31 U.S.C. § 3729(a)(1)(G).

189.

Specifically, Defendant Milton Hall is in possession of known overpayments
that have not been refunded, or have not been fully refunded, to CMS. Defendants
Nachman and Xenicus have counseled, advised, and knowingly caused and assisted
Milton Hall not to deliver all of the known overpayments back into the possession
of the United States Government.

190.

By law, medical providers who have received an overpayment from Medicare
are required to report and return the overpayment within a specified time period, and
"[a]ny overpayment retained by a person after the deadline for reporting and
returning the overpayment" can give rise to liability under the FCA. 42 U.S.C. §

1320a-7k(d); 42 C.F.R. § 422.326(d). Defendants have failed to report and return overpayments in violation of the FCA.

191.

Defendants' conduct described in this Count was knowing in that Defendants had actual knowledge, or at a minimum acted in deliberate ignorance or reckless disregard of the fact, that their failure to report the existence of identified overpayments or return them would result in their continued unlawful retention of money that should have been remitted to the United States Government.

192.

Defendants' conduct described in this Count has deprived and is continuing to deprive the United States Government of the possession and use of funds that it would otherwise exercise dominion and control over but for Defendants' unlawful conduct. That unlawful conduct has therefore caused substantial damage to the United States, and it has enriched and profited and is continuing to enrich and profit Defendants at the expense of the Government and taxpayers.

### Count IV: Conspiracy to Violate the FCA
### 31 U.S.C. § 3729(a)(1)(C)
### (All Defendants)

193.

Keita incorporates the preceding allegations as if fully restated herein.

194.

The unlawful actions described in this Complaint were the product of an extensive and ongoing conspiracy among Defendants to commit the substantive FCA violations described in Counts I through III.

195.

Defendants Milton Hall and Gallups engaged the services of Xenicus and Nachman and thereafter conspired with Nachman and Xenicus to engage in false and fraudulent billing practices that were sure to profit Defendants at the expense of the United States Government and taxpayers in violation of 31 U.S.C. § 3729(a)(1)(C).

196.

Xenicus and Nachman instructed and advised Milton Hall's employees to engage in the unlawful conduct described in this Complaint.

197.

Additionally, Defendants Milton Hal and Gallups conspired with Defendant Pathology Lab of Georgia to engage in an unlawful kickback and pass-through billing scheme pursuant to which Milton Hall would refer its pathologic laboratory needs to PLG in exchange for PLG's agreement to allow Milton Hall to submit the

bill to Medicare for the laboratory testing and keep a portion of the amount received for those services.

198.

Defendants agreed to engage in an unlawful conspiracy to violate the FCA and took numerous overt acts in furtherance of that conspiracy, all as described above. Defendants are therefore jointly and severally liable for the conduct described in this Complaint and Counts I through III above.

### Count V: Presentation of False Claims to the State of Georgia
### O.C.G.A. § 49-4-168.1(a)(1)
### (All Defendants)

199.

Keita incorporates the preceding allegations as if fully restated herein.

200.

Defendants have knowingly presented and caused to be presented multiple false and fraudulent claims for payment by the State of Georgia, in violation of O.C.G.A. § 49-4-168.1(a)(1).

201.

Defendants violated § 49-4-168.1(a)(1) by, *inter alia*: (1) submitting claims to Medicaid for services that carried higher reimbursement rates than the services actually provided (i.e., upcoded claims); (2) submitting claims to Medicaid for

services that were provided by non-Medicaid credentialed providers yet billed using the name and NPI number of Medicaid-credentialed providers; (3) submitting claims to Medicaid containing diagnostic and procedure codes that had been altered without the approval of the medical provider when other diagnostic or procedure codes with lower reimbursement rates were appropriate; (4) submitting claims to Medicaid that expressly or implicitly certified that certain procedures were medically necessary when Defendants knew that they were not; and (5) submitting claims to Medicaid for laboratory and other services performed by PLG but that represented that the services had been provided by Milton Hall so that the State of Georgia would reimburse Milton Hall for services it did not perform.

202.

Although Milton Hall was the billing entity, Nachman, Xenicus, Gallups, and PLG actively participated in the violations of § 49-4-168.1(a)(1) described in this Complaint and Count by either knowingly submitting the false claims for reimbursement by the State of Georgia or by knowingly assisting and causing false claims to be submitted to the State of Georgia.

203.

Defendants' conduct described in this Count was knowing in that Defendants had actual knowledge that the Medicaid claims being submitted for payment were

- 68 -

false and fraudulent, or at a bare minimum, that Defendants acted in deliberate ignorance or reckless disregard of the false and fraudulent nature of the claims.

204.

The State of Georgia has paid these false and fraudulent claims submitted by Defendants and has therefore suffered substantial damages as a consequence of Defendants' unlawful conduct. Defendants received payment and were thereby enriched and profited from the unlawful, false, and fraudulent conduct described in this Count.

### Count VI: False Records and Statements—Payments from the State of Georgia
### O.C.G.A. § 49-4-168.1(a)(2)
### (All Defendants)

205.

Keita incorporates the preceding allegations as if fully restated herein.

206.

Defendants knowingly made, used, and caused to be made and used false records and statements material to false and fraudulent claims submitted to the State of Georgia for payment, in violation of O.C.G.A. § 49-4-168.1(a)(2).

207.

Defendants violated § 49-4-168.1(a)(2) by, *inter alia*, (1) altering the billing codes and dates of services on medical bills before submitting the altered bills to

Medicaid for payment; (2) making corresponding alterations to patients' medical records and other documentation to support the false and fraudulent medical bills; (3) certifying that medical procedures were medically necessary when they were not; (4) submitting claims representing that Medicaid-credentialed practitioners performed services actually performed by non-credentialed practitioners; and (5) submitting bills indicating that pathologic laboratory services were provided by Milton Hall when in fact they were provided by PLG.

208.

Although Milton Hall was the billing entity, Gallups, Nachman, Xenicus, and PLG actively participated in the violations of § 3729(a)(1)(B) described in this Complaint and Count by knowingly causing and assisting the creation of false and fraudulent records and statements material to false and fraudulent claims.

209.

Defendants' conduct described in this Count was knowing because Defendants had actual knowledge that the records and statements being made and used were false, fraudulent, and material to the State of Georgia's decision to pay the false claims submitted by Defendants.

210.

At a bare minimum, Defendants acted in deliberate ignorance or reckless disregard of the false nature of the records and statements being made and used in connection with these false claims.

211.

The State of Georgia relied on the false records and statements prepared, used, and submitted by Defendants in deciding to pay the false and fraudulent claims submitted by Defendants, and has therefore suffered substantial damages as a consequence of Defendants' unlawful conduct. And Defendants have received payment and been thereby enriched and profited, from the unlawful, false, and fraudulent conduct described in this Count.

### *Count VII: Reverse False Claims*
### *O.C.G.A. § 49-4-168.1(a)(4) and (7)*
### *(Defendants Milton Hall, Xenicus and Nachman)*

212.

Keita incorporates the preceding allegations as if fully restated herein.

213.

Defendants have knowingly concealed and knowingly and improperly avoided or decreased their obligation to pay money to the Georgia Medicaid program, in violation of O.C.G.A. § 49-4-168.1(a)(7).

- 71 -

214.

Further, Defendants have knowingly kept property or money that was used or to be used by the Georgia Medicaid program and knowingly failed to deliver or caused to be delivered all of that property to the State.

215.

By law, medical providers who have received an overpayment from the Georgia Medicaid program are required to report and return the overpayment to DCH, and the failure to do so is a violation of O.C.G.A. § 49-4-168.1(a)(4) and (7).

216.

Defendant Milton Hall is in possession of known overpayments that have not been refunded, or have not been fully refunded, to DCH. Defendants Xenicus and Nachman have counseled, advised, and knowingly assisted and caused Milton Hall to retain known overpayments and not to deliver those overpayments to DCH, in violation of O.C.G.A. § 49-4-168.1(a)(4) and (7).

217.

Defendants' conduct described in this Count was knowing because Defendants had actual knowledge (or at a minimum acted in deliberate ignorance or reckless disregard of the fact) that their failure to report the existence of identified

overpayments or return them would result in their continued unlawful retention of money that should have been remitted to the Georgia Medicaid program.

218.

Defendants' false and fraudulent conduct described in this Count has deprived and is continuing to deprive the State of Georgia of the possession and use of funds that it would otherwise exercise dominion and control over but for Defendants' unlawful conduct. That unlawful conduct has therefore caused substantial damage to the State of Georgia and caused Defendants to be enriched at the expense of the State of Georgia, the Georgia Medicaid program, and Georgia's taxpayers.

### Count VIII: Conspiracy to Violate the GSFMCA
### O.C.G.A. § 49-4-168.1(a)(3)
### (All Defendants)

219.

Keita incorporates the preceding allegations as if fully restated herein.

220.

The unlawful actions described in this Complaint were the product of an extensive and ongoing conspiracy among Defendants to commit the substantive GSFMCA violations described in Counts V through VII.

221.

Defendants Milton Hall and Gallups engaged the services of Xenicus and Nachman and thereafter conspired with Nachman and Xenicus to engage in false and fraudulent billing practices that were sure to profit Defendants at the expense of the State of Georgia, the Georgia Medicaid program, and Georgia's taxpayers in violation of O.C.G.A. § 49-4-168.1(a)(3).

222.

Xenicus and Nachman instructed and advised Milton Hall's employees to engage in the unlawful conduct described in this Complaint.

223.

Additionally, Defendants Milton Hall and Gallups conspired with Defendant Pathology Lab of Georgia to engage in an unlawful kickback scheme and pass-through billing scheme pursuant to which Milton Hall would refer its pathologic laboratory needs to PLG in exchange for PLG's agreement to allow Milton Hall to submit the bill to Medicaid for the laboratory testing and keep a portion of the amount received for those services.

224.

Defendants agreed to engage in an unlawful conspiracy to violate the GSFMCA and took numerous overt acts in furtherance of that conspiracy, all as

described above. Defendants are therefore jointly and severally liable for the conduct described in Counts V through VII above.

### *Count IX: Retaliation*
### *31 U.S.C. § 3730(h)*
### *(Defendant Milton Hall)*

225.

Keita incorporates the preceding allegations as if fully restated herein.

226.

The FCA provides that "[a]ny employee . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1).

227.

Keita complained about the instructions she was given to engage in conduct that violated the FCA, refused to engage in conduct she reasonably believed to violate the FCA, and took lawful actions to stop violations of the FCA.

228.

In retaliation for Keita's protected activity, Defendant Milton Hall threatened, harassed, and ultimately discharged Keita, in violation of § 3730(h).

229.

Milton Hall's unlawful retaliatory conduct has caused Keita to suffer lost compensation and benefits of employment, lost future earnings, diminished earning capacity, emotional distress, humiliation, mental anguish, attorneys' fees and related expenses, and other economic and non-economic harms which Keita is legally entitled to recover, together with liquidated damages and interest.

### *Count X: Retaliation*
### *O.C.G.A. § 49-4-168.4*
### *(Defendant Milton Hall)*

230.

Keita incorporates the preceding allegations as if fully restated herein.

231.

The GSFMCA provides that "[a]ny employee ... shall be entitled to all relief necessary to make such employee ... whole, if that employee ... is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by such employee ... in furtherance of a civil action under this Code section or other

efforts to stop one of more violations of this article." O.C.G.A. § 49-4-168.4.

232.

Keita complained about the instructions she was given to engage in conduct that violated the GSFMCA, refused to engage in conduct she reasonably believed to violate the GSFMCA, and took lawful actions to stop violations of the GSFMCA.

233.

In retaliation for Keita's protected activity, Defendant Milton Hall threatened, harassed, and ultimately discharged Keita, in violation of § 49-4-168.4.

234.

Milton Hall's unlawful retaliatory conduct has caused Keita to suffer lost compensation and benefits of employment, lost future earnings, diminished earning capacity, emotional distress, humiliation, mental anguish, attorneys' fees and related expenses, and other economic and non-economic harms which Keita is legally entitled to recover, together with liquidated damages and interest.

WHEREFORE, Keita respectfully asks this Court to:

1.　accept this Complaint for filing under seal until such time as it is appropriate for the Complaint to be unsealed;

2.　enter judgment in favor of the United States of America on Counts I through IV of this Complaint;

3.      enter judgment in favor of the State of Georgia on Counts V through VIII of this Complaint;

4.      enter judgment in favor of Keita on Counts IX and X of this Complaint;

5.      award all damages (including liquidated and double or treble damages), civil penalties, relators' shares, attorneys' fees and expenses of litigation, and other relief allowed by the FCA, the GSFMCA, or other applicable laws;

6.      award Keita a relator's share at the maximum rate permitted under the FCA and the GSFMCA;

7.      grant a trial by jury on all issues so triable; and

8.      grant any further relief deemed necessary, proper, or just.

Submitted: February 6, 2020.[1]


PARKS, CHESIN & WALBERT, PC      CAPLAN COBB LLP

*/s/ Jennifer K. Coalson*             */s/ Michael A. Caplan*
Jennifer K. Coalson                  Michael A. Caplan
Georgia Bar No. 266989               Georgia Bar No. 601039
jcoalson@pcwlawfirm.com              mcaplan@caplancobb.com

---

[1] Pursuant to Local Rule 7.1(D), undersigned counsel certifies that this filing has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1.

Dustin L. Crawford
Georgia Bar No. 758916
dcrawford@pcwlawfirm.com

75 Fourteenth St. NE, Suite 2600
Atlanta, Georgia 30309
(404) 873–8000 (Phone)
(404) 873–8016 (Fax)

Julia Blackburn Stone
Georgia Bar No. 200070
jstone@caplancobb.com

75 Fourteenth St. NE, Suite 2750
Atlanta, Georgia 30309
(404) 596–5600 (Phone)
(404) 596–5604 (Fax)

*Counsel for Relator Lydia Keita*